[No. B005675. Second Dist., Div. Seven. Apr. 16, 1985.]

INSTITUTE IN BASIC YOUTH CONFLICTS, INC.,
Plaintiff and Appellant, v.
STATE BOARD OF EQUALIZATION, Defendant and Appellant.

1094

**COUNSEL**

Buchalter, Nemer, Fields, Chrystie & Younger and Bernard E. LeSage for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, Edmond B. Mamer and David S. Chaney, Deputy Attorneys General, for Defendant and Appellant.

**OPINION**

**HARRIS, J.**\*—Defendant California State Board of Equalization (Board) appeals from a judgment after trial by court refunding sales and use taxes paid by plaintiff under protest. The judgment was for the refund, plus interest, of taxes assessed for the period 1975 through 1978, and 1979 through September 30, 1981.

After trial but prior to entry of judgment plaintiff moved to amend its complaint to include additional taxes allegedly self-assessed and paid, but as to which no claim had ever been filed with the Board, and for attorneys' fees. The court denied both motions after hearing and plaintiff cross-appeals from these rulings.

Plaintiff is a nonprofit religious corporation exempt from federal and state income taxation. Plaintiff's religious mission is to introduce youth and parents to God through Jesus Christ and to give instruction through seminars and publications on how to apply God's basic principles of life as revealed in the Scriptures. Plaintiff conducts seminars throughout the United States which are attended by both laypersons and religious leaders. These seminars consist of four evening sessions, Monday through Thursday, and two all-day sessions on Friday and Saturday, for a total of approximately thirty-two hours.

The registration fee for a person attending a seminar for the first time is $45. If an attendee is indigent or has attended a prior seminar the program

---

*Assigned by the Chairperson of the Judicial Council.

and materials are free. Before January 1980, the registration form provided for a separate $15 charge for the syllabus. After January 1980, there was no separate charge stated.

The syllabus is used to help follow the seminar. Until 1981 it consisted of a ring binder notebook and looseleaf pages containing an outline of the lectures. After 1981 the syllabus contained a bound outline and textbook. When the syllabus was in looseleaf form, the printed material was furnished daily for inclusion in the three-ringed notebook. Numerous blank pages were included in both formats to encourage note taking and the entry of personal reflections. The notebooks were published by the plaintiff at a cost of about $3 each.

The syllabus is not available to persons who have not attended a seminar. However, the plaintiff publishes other religious books and pamphlets. These are available at the seminars or through the mail. Some of the pamphlets are distributed free of charge and others are sold. This religious literature is not directly related to the seminars but is aimed at the general religious mission of the plaintiff.

After audit for the period January 1, 1975 to December 31, 1978 the Board assessed sales tax liability against the plaintiff computed on the sale of syllabus notebooks distributed to seminar participants for a separate charge, in the amount of $51,959.40; for the sale of religious literature other than the syllabus notebooks at seminars, in the amount of $5,423.72; and for unreported sales of mail order religious literature, in the amount of $3,507.85. The plaintiff paid the taxes and applied for a refund on the ground that the distribution of the syllabus notebooks to seminar participants was incidental to the rendition of seminar services, notwithstanding a separately stated charge,[1] and on the further ground that the imposition of sales

---

[1] Sales tax is not applicable to the rendition of a service. Where some tangible personal property is transferred with the rendition of a service, the taxability of the transaction is generally governed by Administrative Code, title 18, section 1501 which provides in pertinent part:

"1501. Service Enterprises Generally. Persons engaged in a business of rendering service are consumers, not retailers, of the tangible personal property which they use incidentally in rendering the service . . . .

"The basic distinction in determining whether a particular transaction involves a sale of tangible personal property or the transfer of tangible personal property incidental to the performance of a service is one of the true objects of the contract; that is, is the real object sought by the buyer the service per se or the property produced by the service. If the true object of the contract is the service per se, the transaction is not subject to tax even though some tangible personal property is transferred. For example, a firm which performs business advisory, record keeping, payroll and tax services for small businesses and furnishes forms, binders, and other property to its clients as an incident to the rendition of its services is the consumer and not the retailer of such tangible personal property. The true object of the contract between the firm and its client is the performance of a service and not the furnishing of tangible personal property. . . ."

and use taxes upon the sale of religious literature was a violation of the free exercise clause of the United States Constitution. The claim was denied and, after exhausting its administrative remedies, the plaintiff filed its complaint for refund in the superior court.

While the action was pending a second audit was conducted for the period January 1, 1979 to September 30, 1981 and the Board assessed additional tax liability against the plaintiff in the amount of $11,952.12 for the sale of syllabus notebooks from January 1, 1979 to January 31, 1980. After January 1980 the plaintiff discontinued its practice of stating a separate charge for its syllabus notebooks at its seminars and, accordingly, the Board did not compute sales tax on the distribution of the notebooks after January 1980. However, since the materials in the notebooks were purchased outside the state and there was no indication that sales tax was paid or due at the time of purchase, the Board assessed a use tax on the cost of syllabus notebooks used between February 1, 1980 and September 30, 1981, in the amount of $818.18. The Board also assessed a sales tax on the sale at seminars of religious literature other than the syllabus notebooks, in the amount of $6,517.52, and on the sale of religious literature by mail order, in the amount of $2,031.

Plaintiff paid the second assessment and filed a claim for refund on the identical grounds used in its first claim for refund. The claim was denied by the Board and the plaintiff amended its complaint in the superior court to include a prayer for the taxes paid in connection with the second audit.

■ The Sales and Use Tax Law imposes upon all retailers a sales tax "[f]or the privilege of selling tangible personal property at retail . . . ." (Rev. & Tax. Code, § 6051.) A "sale" includes any transfer of title of tangible personal property in any manner (Rev. & Tax. Code, § 6006) and the fact that the billing rendered the customer does not show the sales price separately is immaterial. (*Kamp* v. *Johnson* (1940) 15 Cal.2d 187, 190 [99 P.2d 274].) To be a "retailer" the particular individual need not be otherwise engaged in any commercial activity and the primary activity may be the rendering of services. (*Hotel del Coronado Corp.* v. *State Board of Equalization* (1971) 15 Cal.App.3d 612, 618-620 [92 Cal.Rptr. 456].)

■ The use tax is complementary to the sales tax. Revenue and Taxation Code section 6201 provides that "[a]n excise tax is hereby imposed on the storage, use, or other consumption in this state of tangible personal property purchased from any retailer . . . for storage, use, or other consumption," at the same rate as the sales tax. Although the incidence of the use tax is on the purchaser (Rev. & Tax. Code, § 6202), as a general proposition the

law requires the "retailer" to collect the use tax for the state at the time of the sale (Rev. & Tax. Code, §§ 6202-6206).

The California Constitution contains no specific exemptions from the payment of sales or use tax. Although the law itself contains a number of exemptions (Rev. & Tax. Code, §§ 6351-6376; 6381-6396; 6401-6422.1), none of these specific exemptions would exempt the plaintiff herein from sales or use tax liability.[2] However, under Revenue and Taxation Code section 6352 there is a general exemption from both the sales tax and the use tax where "this State is prohibited from taxing under the Constitution or laws of the United States or under the Constitution of this State."

Whether the free exercise clause prohibits California from imposing its sales and use tax in its present form upon the activities of plaintiff is a question of first impression. There is a dearth of authority and what few cases there are tend to involve the interpretation of specific exemption statutes of other states and are not helpful.[3]

In *Jones* v. *Opelika, Bowden* v. *Fort Smith* and *Jobin* v. *Arizona* (1942) 316 U.S. 584 [86 L.Ed. 1691, 62 S.Ct. 1231, 141 A.L.R. 514], each of the petitioners was convicted of selling books and pamphlets of a religious nature without first having procured a license, in violation of the city ordinances involved. The sole constitutional question considered by the Supreme Court was ". . . whether a non-discriminatory license fee, presumably appropriate in amount, may be imposed upon these activities." With four justices dissenting, the United States Supreme Court upheld the ordinances, stating at page 597 [86 L.Ed. at pages 1701-1702] that "[w]hen proponents of religious or social theories use the ordinary commercial methods of sales of articles to raise propaganda funds, it is a natural and proper exercise of the power of the State to charge reasonable fees for the privilege of canvassing."

The judgments in those cases were vacated by the Supreme Court the following year in *Jones* v. *Opelika* (1943) 319 U.S. 103 [87 L.Ed. 1290, 63 S.Ct. 890], for the reasons stated in the opinion of the court in *Murdock* v. *Pennsylvania* (1943) 319 U.S. 105 [87 L.Ed. 1292, 63 S.Ct. 870, 146 A.L.R. 81].

---

[2]Section 6363.5 contains a specific exemption for meals served by religious organizations. This is the only specific exemption from the sales tax law for such organizations.

[3]See: Annotation, Exemption of Religious Organization from Sales or Use Tax (1973) 54 A.L.R.3d 1204.

In *Murdock* the City of Jeannette, Pennsylvania had an ordinance requiring all persons canvassing within the city to procure a license and pay a fee. Petitioners were Jehovah's Witnesses who went from door-to-door in the city distributing literature and soliciting people to purchase religious books and pamphlets published by the Watchtower Bible & Tract Society. None of the petitioners obtained a license under the ordinance and they were convicted and fined for violation of the ordinance. The United States Supreme Court stated that it was concerned ". . . with one narrow issue . . .— the constitutionality of an ordinance which as construed and applied requires religious colporteurs to pay a license tax as a condition to the pursuit of their activities." In holding the ordinance unconstitutional the court pointed out at page 112 [87 L.Ed. at page 1298] that the tax before it was ". . . something quite different, for example, from a tax on the income of one who engages in religious activities or a tax on property used or employed in connection with those activities. It is one thing to impose a tax on the income or property of a preacher. It is quite another thing to exact a tax from him for the privilege of delivering a sermon. The tax imposed by the City of Jeannette is a flat license tax, the payment of which is a condition of the exercise of these constitutional privileges. The power to tax the exercise of a privilege is the power to control or suppress its enjoyment." In answering the argument that the question in determining the constitutionality of a tax is whether the state has given something for which it can ask a return, the court acknowledged the proposition as one of wide applicability but found it irrelevant to the case before it, stating at page 115 [87 L.Ed. at page 1300]: "This tax is not a charge for the enjoyment of a privilege or benefit bestowed by the state. The privilege in question exists apart from state authority. It is guaranteed the people by the Federal Constitution."

In *Follett* v. *McCormick* (1944) 321 U.S. 573 [88 L.Ed. 938, 64 S.Ct. 717, 152 A.L.R. 317], appellant was again a Jehovah's Witness who was a resident of McCormick, South Carolina, where he went from house-to-house selling religious books. He refused to obtain a license and was convicted of violating the local ordinance. The Supreme Court of South Carolina upheld the conviction and distinguished *Murdock* and *Opelika* by pointing out that appellant was not an itinerant but was a resident of the town where the canvassing took place, and that the *Murdock* decision was applicable only to itinerant preachers. The United States Supreme Court reversed. In answer to the argument that it was imposing a religious subsidy on the Town of McCormick the court stated at pages 577-578 [88 L.Ed. at page 941]: "This does not mean that religious undertakings must be subsidized. The exemption from a license tax of a preacher who preaches or a parishioner who listens does not mean that either is free from all financial burdens of government, including taxes on income or property. We said as

much in the *Murdock* case. 319 U.S. p. 112. But to say that they, like other citizens, may be subject to general taxation does not mean that they can be required to pay a tax for the exercise of that which the First Amendment has made a high constitutional privilege."

In *State* v. *Van Daalan* (1943) 69 S.D. 466 [11 N.W.2d 523], appellants were again Jehovah's Witnesses who sold or gave away books and pamphlets explanatory of their beliefs to whomever would take them. They refused to comply with the South Dakota Retail Sales Tax Act which required them to obtain a permit as retailers and make a return on the sale of the books and pamphlets. The Supreme Court of South Dakota reversed their convictions stating at pages 526-527 that "appellants are informed against in the first count in the failure of paying the fee and obtaining the license to transact business. In the second count, with the failure to make a return of sales made by them during a certain period. Both of the counts are brought and predicated upon the theory that the appellants were engaged in and pursuing an occupation without procuring a license and without reporting and paying a tax on sales made by them. This amounts to a tax upon an occupation, vocation or calling. . . . Under its holding [*Murdock*], the state is without authority to require the payment of the tax and impose the duty and obligation upon the appellants."

In *Watchtower B. & T. Soc.* v. *County of L. A.* (1947) 30 Cal.2d 426 [182 P.2d 178], books and other literature used by the Jehovah's Witnesses in the exercise of their religion were stored in the County of Los Angeles and were assessed by the county as personal property subject to taxation. The plaintiff contended that religious literature used by a religious organization in the exercise of its religion or worship may not be taxed by reason of the constitutional guarantees of freedom of religion, speech and press. The California Supreme Court held that a general, uniform, nondiscriminatory ad valorem property tax for revenue purposes may be levied and that neither *Murdock* nor *Follett* held otherwise, the court quoting from *Follett* the same language that we have set forth above.

*State* v. *Toolen* (1964) 277 Ala. 120 [167 So.2d 546], arose under the Sales and Use Tax Law of Alabama. As a result of an audit, St. Mary's Catholic Church in Mobile was charged with use taxes and interest amounting to $328.95. The assessment was paid under protest and appealed. Appellant did not question its liability for either sales or use tax on "normal parish supplies such as pencils, stationery and business supplies" but contested the tax on items used exclusively in connection with religious worship, such as the purchase and use of sacramental wine, candles, chalices and missals. The court held that the items in question were not exempt from

the Alabama Use Tax and stated that neither ". . . the *Van Daalan* case or the *Murdock* case is pertinent authority here." (167 So.2d at p. 549.) The court went on to say at page 550 that "the Van Daalan case was properly decided because the tax in South Dakota was held to be a tax on the occupation of preaching by Jehovah's Witnesses, and such a tax is unconstitutional under the decision of the Federal Supreme Court in Murdock." The court did not discuss whether the Alabama Sales and Use Tax Law required a license to pursue an occupation but instead relied upon the decision of the California Supreme Court in *Watchtower B. & T. Soc.* v. *County of L. A.,* *supra,* 30 Cal.2d 426, holding that an ad valorem personal property tax on stored religious literature was valid. The court reasoned that in *Watchtower* the tax on the religious books and pamphlets was on their storage, prior to their use, and that in the case before it ". . . Alabama Use Tax is a tax on retail sales of articles to be stored, used or consumed in this State and attaches when the goods come to rest in Alabama, prior to their use and irrespective of what that use may be." (167 So.2d at p. 551.)

In 1980 in connection with a regulation then under consideration by the State Board of Equalization to make specific the application of the California Sales and Use Tax Law to transactions in which educational materials are furnished to students by institutions, organizations, or persons providing instructional services, the Attorney General of the State of California was requested to give his opinion as to whether the proposed regulation would be constitutional as applied to church-related schools. Although the opinion is expressly limited to primary and secondary schools, it was the conclusion of the California Attorney General "that neither a sales tax nor a use tax may be constitutionally imposed upon textbooks or other educational materials 'sold' to its students by church related schools." (63 Ops.Cal.Atty.Gen. 69, 85 (1980).) The Attorney General distinguished *State* v. *Toolen, supra,* and described the "taxable moment" found to exist in *Toolen* as "tenuous at best." In discussing *Van Daalan* the Attorney General reasoned at page 82: "In California, as in North [*sic*] Dakota, the sales tax is a privilege or occupation tax. Section 6051 states that the tax is imposed 'upon all retailers' '[f]or the privilege of selling tangible personal property at retail.' Or as characterized in *Roth Drug, Inc.* v. *Johnson* (1936) 13 Cal.App.2d 720, 736 [57 P.2d 1022], which upheld the constitutionality of the Retail Sales Act: '[t]he system of imposing an excise tax *for the privilege of conducting a business* which is based on a percentage of the gross receipts therefrom has long been recognized as valid.' (Emphasis added.) And as the United States Supreme Court has held, a tax may not be imposed or exacted for the privilege of engaging in the exercise of one's religion under the Free Exercise Clause. (*Murdock* v. *Pennsylvania, supra,* 319 U.S. 105.)"

In *Kollasch* v. *Adamany* (1980) 99 Wis.2d 533 [299 N.W.2d 891], Sisters of the Benedictine Order of Nuns sought a declaratory judgment against the Secretary of the Department of Revenue of Wisconsin claiming that the state's threat to impose sales tax on them violated their right to free exercise of their religion. The sisters for many years had made their priory available to individuals or groups for retreats or for use as a meeting place. The state contended that the fee charged by the sisters for meals served to those who visited the priory was subject to Wisconsin's sales tax. The Wisconsin Court of Appeals found that the sisters were pursuing a purely religious purpose in furnishing meals to business groups and that they were engaging in the free exercise of their religion in so doing. The majority acknowledged that the sisters would be required to pay a $2 permit fee as a condition of obtaining a sales tax permit but treated this as nominal. The majority distinguished *Murdock* on the ground that a sales tax may be collected from the consumer and thus the sisters were not being asked to pay a tax as a condition of the exercise of their religion, but instead were being asked to collect a tax from the consumer and pass it along to the state. The majority concluded that the only burden placed on the sisters would be the keeping of more complete bookkeeping records and that this would not burden their free exercise of their religious beliefs. The dissent regarded the Wisconsin Sales Tax Law as imposing a tax on retailers for the privilege of selling, and in this case on the privilege of selling meals. Because all of the justices agreed that the sisters exercised their religion when they sold meals, the dissent regarded a tax on those sales as a tax on their exercise of a constitutional right, and therefore prohibited by *Murdock*. The Court of Appeals was reversed on other grounds by the Supreme Court of Wisconsin in *Kollasch* v. *Adamany* (1981) 104 Wis.2d 552 [313 N.W.2d 47]. The Wisconsin Supreme Court held that the sisters were not "retailers" within the sales tax statute, and thus did not reach the constitutional question.

In *United States* v. *Lee* (1982) 455 U.S. 252 [71 L.Ed.2d 127, 102 S.Ct. 1051], appellee was a member of the Old Order Amish and employed several other Amish to work on his farm and in his carpentry shop. He did not file quarterly Social Security tax returns required of employers, withhold Social Security tax from his employees, or pay the employer's share of Social Security taxes on the ground that the Amish believe it is sinful not to provide for their own elderly and needy and therefore are religiously opposed to the national Social Security system. The United States Supreme Court accepted appellee's contention that payment of the taxes or receipt of benefits violates Amish religious beliefs and, therefore, that compulsory participation in the Social Security system interfered with appellee's free exercise rights. The Supreme Court went on to say, however, that not all burdens on religion are unconstitutional and that the state may justify a

limitation on religious liberty by showing that it is necessary to accomplish an overriding governmental interest. The court found the government's interest in assuring mandatory participation in the Social Security system to be very high, and that accommodating the Amish belief would unduly interfere with fulfillment of the governmental interest. The court concluded by saying at page 261 [71 L.Ed.2d at pages 134-135]: "When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity."

We come finally to *Minneapolis Star* v. *Minnesota Comm'n of Rev.* (1983) 460 U.S. 575 [75 L.Ed.2d 295, 103 S.Ct. 1365]. In that case Minnesota had assessed a special use tax against publications for the cost of ink and paper used in producing the publications. The statute exempted the first $100,000 of such costs in any calendar year from the use tax and also exempted the publications from the state's general sales tax. The Minneapolis Star challenged the imposition of the use tax on ink and paper used in publications as a violation of the guarantees of freedom of the press and equal protection. The special use tax was held by the United States Supreme Court to violate the First Amendment because it singled out the press and also because it targeted a small group of newspapers. The court stated 460 U.S. at page 586 [75 L.Ed.2d at page 305]: "The main interest asserted by Minnesota in this case is the raising of revenue. Of course that interest is critical to any government. Standing alone, however, it cannot justify the special treatment of the press, for an alternative means of achieving the same interest without raising concerns under the First Amendment is clearly available: the State could raise the revenue by taxing businesses generally, avoiding the censorial threat implicit in a tax that singles out the press."

Of particular interest to us here is footnote 9 to the *Minneapolis Star* opinion concerning the constitutionality of a generally applicable sales tax: " ⁹Star Tribune insists that the premise of the State's argument—that a generally applicable sales tax would be constitutional—is incorrect, citing *Follett* v. *McCormick*, 321 U.S. 573 [88 L. Ed. 938, 64 S. Ct. 717] (1944), *Murdock* v. *Pennsylvania*, 319 U.S. 105 [87 L. Ed. 1292, 63 S. Ct. 870] (1943), and *Jones* v. *Opelika*, 319 U.S. 103 [87 L. Ed. 1290, 63 S. Ct. 890] (1943). We think that *Breard* v. *Alexandria*, 341 U.S. 622 [95 L. Ed. 1233, 71 S. Ct. 920, 46 Ohio Ops. 74, 62 Ohio L. Abs. 210, 35 A.L.R.2d 335] (1951), is more relevant and rebuts Star Tribune's argument. There, we upheld an ordinance prohibiting door-to-door solicitation, even though it applied to prevent the door-to-door sale of subscriptions to magazines, an activity covered by the First Amendment. Although *Martin* v. *Struthers,*

319 U.S. 141 [87 L. Ed. 1313, 63 S. Ct. 862] (1943), had struck down a similar ordinance as applied to the distribution of free religious literature, the *Breard* Court explained that case as emphasizing that the information distributed was religious in nature and that the distribution was noncommercial. 341 U.S., at 642-643 [95 L. Ed. 1233, 71 S. Ct. 920, 46 Ohio Ops. 74, 62 Ohio L. Abs. 210, 35 A.L.R.2d 335]. As the dissent in *Breard* recognized, the majority opinion substantially undercut both *Martin* and the cases now relied upon by Star Tribune, in which the Court had invalidated ordinances imposing a flat license tax on the sale of religious literature. See [*id.*], at 649-650 [95 L. Ed. 1233, 71 S. Ct. 920, 46 Ohio Ops. 74, 62 Ohio L. Abs. 210, 35 A.L.R.2d 335] (Black, J., dissenting) ('Since this decision cannot be reconciled with the *Jones, Murdock* and *Martin* v. *Struthers* cases, it seems to me that good judicial practice calls for their forthright overruling'). Whatever the value of those cases as authority after *Breard*, we think them distinguishable from a generally applicable sales tax. In each of those cases, the local government imposed a flat tax, unrelated to the receipts or income of the speaker or to the expenses of administering a valid regulatory scheme, as a *condition* of the right to speak. By imposing the tax as a condition of engaging in protected activity, the defendants in those cases imposed a form of prior restraint on speech, rendering the tax highly susceptible to constitutional challenge. *Follett, supra,* at 576-578 [88 L. Ed. 938, 64 S. Ct. 717]; *Murdock, supra,* at 112, 113-114 [87 L. Ed. 1292, 63 S. Ct. 870]; *Jones* v. *Opelika,* 316 U.S. 584, 609, 611 [86 L. Ed. 1691, 62 S. Ct. 1231] (1942) (Stone, C. J., dissenting), [adopted as opinion of Court] 319 U.S. 103, [87 L. Ed. 1290, 63 S. Ct. 890] (1943); see *Grosjean* v. *American Press Co.,* 297 U.S., at 249 [80 L. Ed. 660, 56 S. Ct. 444]; see generally *Near* v. *Minnesota* . . . [*supra*], 283 U.S. 697, [75 L. Ed. 1357, 51 S. Ct. 625]. . . . In that regard, the cases cited by Star Tribune do not resemble a generally applicable sales tax. Indeed, our cases have consistently recognized that nondiscriminatory taxes on the receipts or income of newspapers would be permissible, *Branzburg* v. *Hayes,* 408 U.S. 665, 683 [33 L. Ed. 2d 626, 92 S. Ct. 2646] (1972) (dictum); *Grosjean* v. *American Press Co., supra,* at 250 [80 L. Ed. 660, 56 S. Ct. 444] (dictum); cf. *Follett, supra,* at 578 [88 L. Ed. 938, 64 S. Ct. 717] (preacher subject to taxes on income or property) (dictum); *Murdock, supra,* at 112 [87 L. Ed. 1292, 63 S. Ct. 870] (same) (dictum)."

The tax in this case is not a flat tax and it is related to the receipts or income of the plaintiff (hereafter respondent). ■ However, as the opinion of the California Attorney General makes clear, the California Sales and Use Tax Law is drafted as a privilege or occupation tax imposed upon the privilege of selling tangible personal property at retail. The trial court found and the California State Board of Equalization does not dispute that respon-

dent is a religious organization which accomplishes its religious mission through its services, seminars, and religious publications. What footnote 9 in *Minneapolis Star* leaves unclear is whether a tax related to "receipts or income . . . or to the expenses of administering a valid regulatory scheme" may be imposed "as a condition of engaging in protected activity . . . ."

We believe the answer to this question may be gleaned not from footnote 9 but from the language above-quoted from the opinion itself in *Minneapolis Star*. The interest of California here, as with Minnesota, is the raising of revenue. That interest alone, however, cannot justify a privilege or occupation tax as a condition of engaging in protected activity if there is "an alternative means of achieving the same interest without raising concerns under the First Amendment . . . ." (460 U.S. at p. 586 [75 L.Ed.2d at p. 305].) In the case before us, the California Use Tax Law imposes an excise tax "on the storage, use, or other consumption in this state of tangible personal property" without raising concerns under the First Amendment. This explains the holding of the court in *State* v. *Toolen, supra.*

We do not hold that the Legislature cannot impose a generally applicable sales tax upon respondent herein but simply that the method it has chosen, a privilege or occupation tax, is constitutionally infirm under the First Amendment when applied to respondent. As stated in *Murdock, supra,* 319 U.S. at page 115 [87 L.Ed. at page 1300], "[t]he privilege in question exists apart from state authority. It is guaranteed the people by the Federal Constitution." Accordingly, respondent cannot be taxed for the privilege of doing that which it has already the right to do.

■ We recognize that the effect of this decision is to exempt respondent from the California Sales Tax but not the California Use Tax. As stated in *Union Oil Co.* v. *State Bd. of Equal.* (1963) 60 Cal.2d 441, 449 [34 Cal.Rptr. 872, 386 P.2d 491], "[i]n substance, the sales and use tax laws constitute a double filter designed to catch all transactions which result in tangible personal property joining the aggregate of capital assets within the state." The Use Tax is on the consumer (Rev. & Tax. Code, § 6202) but the retailer is required to collect the Use Tax for the state at the time of the sale (Rev. & Tax. Code, § 6203). A receipt from a retailer given to the consumer pursuant to Revenue and Taxation Code section 6203 relieves the consumer from further liability for the tax to which the receipt refers. (Rev. & Tax. Code, § 6202.) Whether respondent is regarded as a consumer or retailer of the syllabus notebooks and religious literature it remains liable for the use tax unless a receipt can be produced.[4]

---

[4]We neither approve nor disapprove of the opinion of the California Attorney General that

■ Respondent next contends and the trial court found that the exemptions given respondent from income tax by the United States Government (26 U.S.C. § 501(c)(3)) and the State of California (Rev. & Tax. Code, § 23701d) estopped the Board from imposing a Sales and Use Tax on respondent. Respondent's argument and the trial court's holding is based on *Murdock* and its language at page 112 [87 L.Ed. at page 1298] to the effect that those "who can tax the privilege of engaging in . . . missionary evangelism can close its doors to all those who do not have a full purse." As we have noted above, this argument applies to the California Sales Tax but not to the California Use Tax. In any event, tax exemptions are a matter of legislative beneficence and an exemption from income tax does not estop the state from imposing taxes in other areas. (See *Cypress Lawn C. Assn.* v. *San Francisco* (1931) 211 Cal. 387 [295 P. 813]; *Atlantic Coast Line* v. *Phillips* (1947) 332 U.S. 168 [91 L.Ed. 1977, 67 S.Ct. 1584, 173 A.L.R. 1].)

■ The final issue raised by respondent is whether the application of the California Sales and Use Tax to it by the state Board violates the equal protection and due process clauses of the United States and California Constitutions. We will consider only the equal protection argument.[5]

The trial court held that imposition of the Sales and Use Tax by the Board on respondent's religious publications, while not imposing the sales and use tax on similar transactions and organizations, was a violation of the equal protection clause of the United States and California Constitutions. The trial court's holding was based upon what it believed to be an unequal application of regulation 1502, subdivision (e);[6] an acknowledgment by the Board's employees that imposition of the sales tax on respondent was inconsistent with the Board's policies and practices; and a finding by the court that other similar organizations distributing syllabus materials at seminars or classes were not taxed.

As discussed above, whether the respondent is classified as a consumer, and therefore responsible for use tax, or as a retailer, and therefore respon-

---

a use tax may not be constitutionally imposed upon textbooks or other educational materials "sold" by primary and secondary church-related schools to their students, since that opinion was carefully limited to those facts, which are not here involved. (63 Ops.Cal.Atty.Gen. 69, 83-85.)

[5]Although respondent raises the due process clause in its statement of issues, it is not discussed in the brief. Accordingly, we do not consider it here.

[6]Regulation 1502, subdivision (e) provides: "(e) Training. Service bureaus provide a number of training services, such as keypunching and keystroke verifying, programming and specialized training in systems design. The service bureau is the consumer of tangible personal property which is used in training others, and the retailer of training materials, including books, which it furnishes to trainees for a separate charge." (Cal. Admin. Code, tit. 18, § 1502, subd. (e).)

sible for the collection of the use tax, respondent has been caught in the "filter" of the use tax. Moreover, the language of regulation 1502, subdivision (e) does not provide an exemption from the California Sales and Use Tax Law. It simply classifies when a service bureau will be treated as a retailer and therefore required to obtain a seller's permit and do the other things required of retailers by the law.

The alleged acknowledgment by the Board's employees that the treatment of respondent by the Board is inconsistent with its own policies and practices is again simply a "retailer" versus "consumer" dispute. A hearing officer on the first audit stated in his report: "Were the petitioner to make no breakdown of the $45 seminar fee, the petitioner would be held to be the consumer of the syllabuses. Only when a person wished to buy a syllabus separately would a taxable retail sale occur." Subsequently, respondent ceased breaking down the $45 seminar fee but the Board in its second audit refused to follow the first audit report. Even if the Board had done so, as noted above, respondent would be liable as a consumer for the California Use Tax. The dispute within the Board was simply whether respondent was a "retailer" for sales tax purposes or a "consumer."

The finding by the trial court that the Board imposed the Sales and Use Tax Law on the respondent while not imposing the same law on other similar organizations distributing syllabus materials at their seminars or classes appears again to be a "retailer" versus "consumer" dispute. For example, respondent contended that there was a difference in treatment by the Board between respondent and the Continuing Education of the Bar and Bar Review courses where syllabus materials were distributed. The Board acknowledged that where there is classroom instruction and materials are not furnished for a separate charge, the organization putting on the program is treated as the consumer of the materials distributed and that this included the Continuing Education of the Bar and Bar Review courses. As pointed out above, however, the argument misses the mark where the question is whether the Sales or Use Tax Law will be applied at all, as here.

Conversely, when the question is the measure of the use tax and not its applicability, the arguments of respondent are relevant. The Board would classify respondent as a retailer of the syllabus notebooks when a separate charge is made for them and contends the correct measure of the use tax to be the separately stated price of $15 per syllabus notebook. The trial court found respondent to be a consumer of the syllabus notebooks. Since respondent published its own notebooks the measure of the use tax would be

the price paid for the ingredients necessary to make them or about $3 each. There is substantial evidence to support the finding of the trial court.[7]

The only remaining issue is the appeal of respondent from the denial of its motions to amend its complaint to include a prayer for the refund of self-assessed sales and use taxes, and for attorneys' fees. The denial of those motions was clearly within the discretion of the trial court and no abuse of that discretion has been shown.

The cause must be remanded to determine the amount of refund to which the respondent is entitled, since the amount of use tax owed is a different computation in this case from that of sales tax.

Reversed and remanded.

Thompson, Acting P. J., and Johnson, J., concurred.

Petitions for a rehearing were denied May 15, 1985, and the opinion was modified to read as printed above. The petition of plaintiff and appellant for review by the Supreme Court was denied July 25, 1985.

---

[7]The parties stipulated to the essential facts in this case and proceeded on appeal by way of a joint appendix. Accordingly, appellant urges that we exercise our independent judgment in this matter. (*Anaconda Co.* v. *Franchise Tax Board* (1982) 130 Cal.App.3d 15, 23 [181 Cal.Rptr. 640]; *Container Corp. of America* v. *Franchise Tax Board* (1981) 117 Cal.App.3d 988, 993 [173 Cal.Rptr. 121]; *Automatic Canteen Co.* v. *State Board of Equalization* (1965) 238 Cal.App.2d 372, 381 [47 Cal.Rptr. 848].) Whether respondent was a retailer or a consumer is a question of ultimate fact, not of law, determined by the trial court on some conflicting evidence in the record. We decline to interfere with the determination of the trial court.